# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 50

**APRIL TERM, A.D. 2025**

**April 30, 2025**

EKATERINA NICHOLAEVNA
POKROVSKAYA, a/k/a YEKATERINA
POKROVSKAIA,

Appellant
(Defendant),

v.                                                                    S-24-0220

ERIC VAN GENDEREN SR.,

Appellee
(Plaintiff).

*Appeal from the District Court of Teton County*
*The Honorable F. Scott Peasley, Judge*

*Representing Appellant:*
        Ekaterina Pokrovskaya, pro se.

*Representing Appellee:*
        Eric Van Genderen Sr., pro se.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   In a 2016 divorce decree, Eric Van Genderen Sr. (Father) received custody of the minor child, EVG, subject to Ekaterina Nicholaevna Pokrovskaya's (Mother) visitation. In 2022, Mother sought modification of her visitation. The district court granted Mother's request and ordered a graduated visitation schedule. Mother appeals. We affirm.

## *ISSUES*

[¶2]   Mother asserts five issues, which we consolidate and rephrase as one issue, did the district court abuse its discretion in setting the terms and conditions of the modified visitation order.

[¶3]   In response, Father raises several issues. We address two of these, whether Mother's appeal was timely and whether the district court lacked jurisdiction over this matter, and do not reach Father's remaining issues because he did not separately appeal. *Koch v. Gray*, 2024 WY 41, ¶ 2, 546 P.3d 1095, 1097 n.2 (Wyo. 2024).

## *FACTS*

[¶4]   Mother and Father married in 1992 and had one child, EVG, born in 2008. In 2016, a stipulated divorce decree was entered in Teton County, Wyoming. At the time of the divorce, Father and EVG lived in Teton County, Wyoming, and Mother lived in Russia. Father was awarded sole custody. Mother was awarded visitation, and Father was required to pay Mother's visitation travel expenses. Father and EVG relocated frequently, and at various times lived in Russia, the United Arab Emirates, Morocco, the United States, Armenia, and Bahrain. They moved back to the United States most recently in May 2021. Father and EVG currently reside in Florida. Mother continues to reside in Russia.

[¶5]   This matter began in June 2022, when Mother filed a petition to modify the divorce decree in Teton County, Wyoming. She accused Father of alienating EVG from her and of failing to abide by the visitation provisions in the divorce decree. She requested, among other things, a phone call/video chat schedule, six weeks of summer visitation at her home, alternate major holidays, and access to EVG's school and other records. Based, at least in part, on Father's refusal "to allow meaningful contact between the child and Mother," the court found a material change in circumstances, and after a hearing, the court modified visitation. The court found "it is in the best interests of the minor child to amend the ambiguous visitation schedule" and ordered EVG to "begin visiting his mother through supervised visitation before leading, potentially, to longer and unsupervised visits." The court established a graduated visitation schedule which, following a transition period that ended June 1, 2024, includes alternating holidays and two weeks during the summer. Father was responsible for Mother's visitation travel costs during the transition period, but not after.

1

[¶6] Mother filed a motion to alter or amend the judgment, which the district court denied. Mother, proceeding pro se, appealed. Father, who also appears pro se, did not cross-appeal. Additional facts are discussed, as necessary, below.

## *STANDARD OF REVIEW*

[¶7]    We review the district court's custody decision for an abuse of discretion. *Bailey v. Bailey*, 2024 WY 65, ¶ 6, 550 P.3d 537, 542 (Wyo. 2024) (citations omitted). "A court abuses its discretion if it acts in a manner that exceeds the bounds of reason under the circumstances, violates some legal principle, or ignores a material factor deserving significant weight." *Id.* (citing *Hyatt v. Hyatt*, 2023 WY 129, ¶ 48, 540 P.3d 873, 888 (Wyo. 2023)). We consider the evidence presented "in the light most favorable to the district court's decision, 'affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence.'" *Ianelli v. Camino*, 2019 WY 67, ¶ 20, 444 P.3d 61, 66 (Wyo. 2019) (quoting *Bishop v. Bishop*, 2017 WY 130, ¶ 9, 404 P.3d 1170, 1173 (Wyo. 2017)). We do not reweigh the evidence. *Id.* (citation omitted).

*Amadio v. Amadio*, 2025 WY 21, ¶ 12, 564 P.3d 259, 264 (Wyo. 2025) (quoting *Vassilopoulos v. Vassilopoulos*, 2024 WY 87, ¶ 7, 557 P.3d 725, 728–29 (Wyo. 2024)).

## *DISCUSSION*

### I.    *Did Mother timely appeal the district court's order modifying custody and visitation?*

[¶8]    The district court issued its order modifying custody and visitation on December 18, 2023. Pursuant to Wyoming Rules of Civil Procedure 52(b) and 59(e), Mother filed a motion to alter or amend that order on January 16, 2024. On May 8, 2024, the district court denied Mother's motion. Mother filed her notice of appeal on June 6, 2024, and an amended notice of appeal correcting clerical errors on June 12, 2024. Father contends that this Court lacks jurisdiction because Mother's notice of appeal was untimely.

[¶9]    Rule 2.01 of the Wyoming Rules of Appellate Procedure requires an appellant to file a notice of appeal "within 30 days from entry of the appealable order . . . ." W.R.A.P. 2.01(a). Rule 2.02 tolls the time for appeal when a motion to amend under W.R.C.P. Rule 52(b) or 59 is filed. It provides:

(a)     The time for appeal in a civil case ceases to run as to all parties when a party timely files a motion for judgment under [W.R.C.P.] 50(b) . . . ; a motion to amend or make additional findings of fact under [W.R.C.P.] 52(b) . . . or W.R.C.P.Ch.C., whether or not alteration of the judgment would be required if the motion is granted; a motion to alter or amend the judgment under [W.R.C.P.] 59 . . . or W.R.C.P.Ch.C., or a motion for a new trial under [W.R.C.P.] 59 . . . or W.R.C.P.Ch.C.

W.R.A.P. 2.02(a). W.R.A.P. 2.02(b) establishes that the "full time for appeal commences to run and is to be computed from the entry of any order granting or denying" a motion made under Rule 2.02(a).

[¶10]   According to W.R.A.P. 2.02(a), the clock measuring Mother's time to appeal ceased to run during the pendency of her motion to alter or amend. Pursuant to W.R.A.P. 2.02(b), the clock began to run anew on May 8, 2024, the day the district court denied her motion. At that time, Mother had 30 days to file her notice of appeal. *See* W.R.A.P. 2.01(a) (full time to appeal is 30 days); 2.02(b) (full time for appeal commences on date order is entered). She filed her notice of appeal on June 6, 2024, 29 days after the clock started. Accordingly, Mother's appeal was timely filed. *See Tucker v. Tucker*, 2023 WY 62, ¶¶ 13–19, 530 P.3d 1084, 1088–89 (Wyo. 2023).

## II.     Did the district court lack jurisdiction?

[¶11]   Father contends the district court lacked jurisdiction over this matter because Mother failed to attach a certified copy of the child custody order to her petition, as required under Wyo. Stat. Ann. § 20-2-203. He also argues Mother was required to comply with the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) and her failure to do so deprived the district court of jurisdiction.

[¶12]   Wyo. Stat. Ann. § 20-2-203(a) provides:

> A court in this state which enters a custody order under W.S. 20-2-201 has continuing subject matter jurisdiction to enforce or modify the decree concerning the care, custody and visitation of the children as the circumstances of the parents and needs of the child require, subject to the provisions of the Uniform Child Custody Jurisdiction and Enforcement Act. . . . A court which has jurisdiction to enforce or modify an order under this section may decline to exercise its jurisdiction if it finds it is an inconvenient forum under the circumstances of the case and that the court which entered the original order is a

3

more appropriate forum and has jurisdiction as set forth in the
Uniform Child Custody Jurisdiction and Enforcement Act.

Wyo. Stat. Ann. § 20-2-203(a) (LexisNexis 2023). The district court issued the original divorce decree and custody order in this matter on October 26, 2016. The district court had continuing jurisdiction to issue its order modifying custody and visitation. Wyo. Stat. Ann. § 20-2-203(a); *Brush v. Davis*, 2013 WY 161, ¶ 11, 315 P.3d 648, 651–52 (Wyo. 2013).

[¶13] Wyo. Stat. Ann. § 20-2-203(c) requires "[a]ny party seeking to enforce or modify a custody order" to "attach a certified copy of the custody order to the petition . . . ." That section does not indicate that the failure to attach a copy of the custody order will deprive the district court of its continuing subject matter jurisdiction. Mother identified the decree she was seeking to modify in her petition, and her petition was filed in the same court and under the same docket number as the original decree. Nothing in the record indicates that Father was unaware of the decree or the grounds for Mother's modification petition. Mother's failure to attach the original decree did not deprive the district court of jurisdiction over the matter. *Brush*, ¶ 13, 315 P.3d at 652 (parent's failure to attach a copy of the original decree did not deprive the district court of jurisdiction over his petition to modify custody).

[¶14] Father contends the Hague Convention applies to this case and required Mother to obtain the translation of all foreign documents and include those translations in her petition to modify visitation in Wyoming. This argument presumably arises out of an earlier attempt by the parties to modify visitation. In 2019, when Father and EVG were living in Bahrain, Mother filed a petition to modify the divorce decree and a motion for an order to show cause in the Teton County, Wyoming district court. The district court dismissed her petition, relying on the inconvenient forum provision of the Uniform Child Custody Jurisdiction and Enforcement Act, Wyo. Stat. Ann. § 20-5-207, and the common law doctrine of forum non conveniens. This Court affirmed the dismissal. *Pokrovskaya v. Van Genderen*, 2021 WY 68, 487 P.3d 228 (Wyo. 2021). In 2020, while still in Bahrain with EVG, Father filed a petition to modify visitation with the Bahraini courts. The Bahraini courts ultimately ruled that the Wyoming decree was enforceable and did not modify visitation.[1] According to Father, Mother's failure to obtain these translated documents deprived the district court of jurisdiction. Father provides no citation or pertinent authority to support his argument. We will not consider it further. *Noe v. State ex rel. Dep't of Fam. Servs., Child Support Enf't Div.*, 2024 WY 127, ¶ 9, 559 P.3d 607, 611 (Wyo. 2024) ("[A]s a general matter, we will not consider issues unsupported by cogent argument and citation to legal authority." (citing cases)).

---

[1] A trial court in Bahrain relieved Father of paying Mother's visitation expenses. An appeals court reversed that ruling, and shortly thereafter, Father and EVG relocated.

### III.     *Did the district court abuse its discretion when it modified visitation?*

[¶15]  To modify an order regarding a child's care, custody, or visitation, a district court must determine whether there has been a material change in circumstances since the entry of the order.  Wyo. Stat. Ann. § 20-2-204(c).  If the court finds a material change in circumstances, it must determine what, if any, "modification would be in the best interests of the child[.]"  Wyo. Stat. Ann. § 20-2-204(c); *see Kimzey v. Kimzey*, 2020 WY 52, ¶ 53, 461 P.3d 1229, 1244 (Wyo. 2020).

> In determining the best interests of the child, the court shall consider, but is not limited to, the following factors:
>
> (i)     The quality of the relationship each child has with each parent;
>
> (ii)     The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;
>
> (iii)     The relative competency and fitness of each parent;
>
> (iv)     Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;
>
> (v)     How the parents and each child can best maintain and strengthen a relationship with each other;
>
> (vi)     How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;
>
> (vii)     The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;
>
> (viii)   Geographic distance between the parents' residences;
>
> (ix)     The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a); *see Kimzey*, ¶ 32, 461 P.3d at 1239. "Ultimately, the 'goal to be achieved is a reasonable balance of the rights and affections of each of the parents, with paramount consideration being given to the welfare and needs of the child[].'" *Kimzey*, ¶ 53, 461 P.3d at 1244 (citation omitted).

[¶16] The district court found that a material change of circumstances had occurred, in large part due to Father's "refus[al] to allow meaningful contact between [EVG] and Mother." Mother does not contest this finding. The district court then turned to an analysis of EVG's best interests. The district court made detailed factual findings for each best interest factor:

[¶17] **Quality of the Parent-Child Relationship** – With regard to the parent-child relationship, it concluded that the evidence supported "two definitive findings"—first, EVG currently resides with Father in Florida and, second, the "inconsistent and hostile" relationship between Father and Mother has resulted in "very limited visitation" between Mother and EVG. The court provided additional detail, finding Mother has recently had "limited to no contact" with EVG. The court attributed this lack of contact to Father and noted that Mother and EVG "had a healthy relationship prior to Father's frequent and often unannounced relocations." The court also noted that Mother has frequently "made efforts to visit her child despite Father's resistance." The court concluded this factor "weighs in favor of supervised visitation with Mother."

[¶18] **The Ability of Each Parent to Provide Adequate Care** – The court found the parents' current living situations were "relatively unknown." However, the court considered evidence that Mother had committed an "act of domestic abuse" against EVG, *see infra* ¶ 26, and concluded that this factor "weighs in favor of Father [retaining custody] and supports defined and supervised visitation with Mother."

[¶19] **The Relative Competency and Fitness of Each Parent** – The court recognized both parents had weaknesses in this area, specifically Father's "'overbearing and arrogant' nature" and Mother's "violent tendencies and sporadic attempts to visit" EVG. The court found "that Mother has a stable living arrangement and employment." It concluded this factor "weighs in favor of Father retaining sole custody and Mother receiving defined supervised visitation."

[¶20] **Each Parent's Willingness to Accept the Responsibilities of Parenting** – The court considered Mother's desire to maintain a relationship with EVG but acknowledged that she lives in Russia and has not exercised visitation in "several years." It also considered Father's ongoing custody, recognizing "[he] maintains steady employment, has stable living arrangements, and tends to [EVG's] needs." The district court expressed

6

disapproval of "Father's choices to defer adult decision-making authority to the child," referring to Father's history of letting the child choose whether to speak with or see Mother. The court weighed this factor in favor of "Mother receiving visitation pursuant to a graduated visitation schedule, beginning in the United States."

[¶21] **Relationship Maintenance Between Parents and Child** – The court found the "poor relationship" between Mother and Father "significantly impacts" each parent's relationship with EVG. The court found Father limited Mother's ability to communicate with EVG. By October 2019, and on "numerous" occasions, Father declined to be the parent and deferred to EVG on visitation with Mother. Mother made two trips to visit EVG in Bahrain, one in November 2019 and a second in February 2020. On her first trip, she remained in Bahrain for a week and was allowed to see EVG once for one to two hours and a second time for one-half hour. On her second trip to Bahrain, Father told Mother, EVG did not want to see her. By February 2020, "Father prohibited any contact or communication between Mother and [EVG]" despite the decree which allowed "up to ten (10) days [visitation] per month." In January 2021, after an attempted communication by Mother, Father blocked Mother's number and refused to provide an address for EVG.

[¶22] The court concluded that "the parties' numerous relocations, coupled with their inability to effectively co-parent from different locations and ambiguous visitation provisions in the Decree, ha[ve] created major problems with Mother's parent-child relationship." The court found this factor weighs in favor of "a graduated and defined visitation schedule."

[¶23] **Parent/Child Interaction and Communication** – The court considered the parents' "historically poor communication" and the evidence of the devolving relationship between Mother and EVG when it weighed this factor. It concluded, again, that this factor weighed "in favor of a gradual supervised visitation schedule with express and clear terms."

[¶24] **Mutual Respect, Willingness, and Ability of Parents to Allow the Other to Provide Care Without Intrusion and to Respect the Other Parent's Rights and Responsibilities** – The court found that both parents struggle in this regard and that the couple's lack of respect for each other has resulted in a "strained relationship between" Mother and EVG. The court explained:

> Father's selective and often unfounded rationale for his interpretation of events, legal proceedings and orders has led to his unilateral application of the visitation provisions [in the decree], and in the process, caused a complete estrangement between [Mother and EVG]. . . . Conversely, Mother takes little to no responsibility for her own shortcomings and failed

visitation, instead blaming Father and/or the minor child for failed attempts to parent.

The court concluded that the lack of mutual respect between the parties weighed in favor of "Father retaining sole custody and Mother receiving supervised visitation pursuant to a defined visitation schedule."

[¶25] **Geographic Distance** – The court considered the vast geographic distance between the parents—Father currently resides in Florida, and Mother in Russia. The court found that this factor weighed in favor of Mother having graduated supervised visitation and "an appropriate allocation of costs" for Mother's travel expenses.

[¶26] **Other Factors** – The court also examined several other factors it determined to be relevant. The court concluded that because Father has been EVG's primary custodial parent since the divorce, Mother and the minor child should be reintroduced through a graduated visitation schedule. Addressing allegations of domestic violence perpetrated by Mother, the court explained,

> Most of the evidence concerning Mother's violent propensities [was] brought out during Mother's cross examination. On issues of domestic violence, like all other components of Father's cross examination of Mother, questions were riddled with hypotheticals. For example, he asked, "is it acceptable to punish a child for not doing what a parent wants?" and "is it appropriate to punish a child who gets into a parent's things?" Another question by Father was "you've got a child staying at one parent's house, is it appropriate for the other parent, in a divorce, to interfere with that parent's punishment?" . . . In response, Mother denied any "violence" outside of the incident when Mother struck Father in the nose.

The court concluded "[d]espite the over-saturation of hypotheticals, there was credible evidence of spousal and child violence. The evidence of child and spousal violence weigh[s] in favor of restricting Mother's visitation and including supervision in a defined schedule and other protective measures for the minor child." The court did not consider EVG's preference because no "direct or even circumstantial evidence of the child's express preference" was provided to the court.

[¶27] After analyzing each of the best interest factors, the district court concluded "it is in the best interests of [EVG] to amend the ambiguous visitation schedule, for the child to remain in Father's sole custody, and to begin visiting his mother through supervised visitation before leading, potentially, to longer and unsupervised visits." The court ordered

8

the parties to comply with a detailed visitation schedule, including immediate phone and supervised visitation, and, provided Mother met certain conditions, gradually transition to unsupervised visitation, with summer and alternate holiday visitation starting in 2025. The court also ordered Father to pay for Mother's visits during a transition period after which Mother would be responsible for her own travel expenses.

[¶28] Mother first contends that the district court abused its discretion because it did not consider her ability to adhere to the graduated visitation schedule. She contends that obtaining a visa is a major factor in her ability to comply with the visitation schedule, and the court failed to require Father to provide her with necessary documentation (such as proof of travel plans, confirmation of financial sponsorship, and his residential address). The district court did consider the distance between the parties and their difficulty in cooperating with each other. *Supra* ¶¶ 23–25. It ordered that Father, "at least twenty (20) days before any visit, provide Mother with his address and phone number." It ordered Mother and Father to "work with each other, in good faith, to effectuate the terms" of the order. While the order does not specifically require Father to provide documentation necessary for Mother's travel to visit EVG, it does require Father to cooperate with Mother to "effectuate the terms" of the order, including its visitation provisions. The order was sufficiently clear for the parties to comprehend and meet their obligations to facilitate visitation, and the district court did not abuse its discretion when it did not make specific provisions regarding Mother's visa.

[¶29] Mother next argues the district court should have allowed her more than two days of visitation during the transition period because short visits are not economical, even when Father is required to pay her expenses. Father does not dispute that travel from Russia to the United States can be costly. The district court found that Mother has not had a visit with EVG "in nearly four (4) years" and that "[t]he child has recently elected to avoid Mother altogether." The district court recognized that this estrangement, along with evidence of domestic violence, weighed in favor of a graduated visitation schedule. Shorter visits during the transition period would allow EVG and Mother to reconnect and would serve as a "protective measure" for the child. Accordingly, the district court held that a graduated visitation schedule was in EVG's best interests. Mother does not bear the cost of these visits, Father does. Father has not appealed. The district court did not abuse its discretion when it ordered shorter initial visits.

[¶30] Mother next argues the visitation schedule was ambiguous as to the number of visits she was entitled to and lacked necessary specificity regarding the requirement that Father provide her with his address, especially given that this information would be needed for her to apply for a visa. The district court's order was explicit on both counts: During the transition period, it ordered that Mother "shall have supervised visitation once per month." It established the date of the first visit (February 10 and 11, 2024) and provided monthly supervised visitation, at Father's expense, on the second Saturday and Sunday of each month through May 2024. Provided Mother exercised at least two weekends of visitation

between February and May, for the next three-month period, the court ordered week-long unsupervised visitation, at Mother's expense, beginning on the first Saturday of each month. And, if Mother exercised at least one visit between June and August, she would have unsupervised visitation every other weekend, beginning September 1, 2024. Provided Mother exercised at least one weekend between September 2024 and summer of 2025, Mother "is entitled to two (2) consecutive weeks of summer visitation" commencing on the second Sunday in July. Finally, the court ordered weekly phone or video visits of no less than 15 minutes to commence immediately on Wednesday evenings at 7:00 p.m., in the time zone where Father and EVG reside. The court also required Father to provide Mother with his address and phone number "at least twenty (20) days before any visit," "keep Mother appraised of [EVG's] address for purposes of arranging visitation and sending mail/gifts at all times," and to "provide Mother a working phone number" for telephone and video visits.

[¶31] Wyo. Stat. Ann. § 20-2-202(a)(i) "requires district courts to '[o]rder visitation in enough detail to promote understanding and compliance.' The visitation provisions must contain a 'degree of detail'" sufficient for "parents to understand their obligations," and for district courts "to enforce the decree by contempt sanctions when necessary." *Rataiczak v. Parker*, 2024 WY 70, ¶ 12, 550 P.3d 1051, 1055 (Wyo. 2024) (quoting *Edwards v. Edwards*, 2020 WY 35, ¶ 20, 459 P.3d 448, 452–53 (Wyo. 2020)). "A proper visitation schedule should specify which days each parent is allowed, contain details concerning overnight visitations, and specify how the visitation will change as the children get older." *Id.* (citing *Long v. Long*, 2018 WY 26, ¶ 27, 413 P.3d 117, 126 (Wyo. 2018)). The visitation provisions described above are clear, unambiguous, and comply with § 20-2-202(a)(i).

[¶32] Mother next contends the district court abused its discretion when it assigned visitation costs after the initial transition period to Mother. She asserts that her net monthly income is less than $1000 per month, but travel costs range between $3000 and $5000, and argues that the district court did not consider Father's ability to pay before requiring her to pay for all post-transition travel. District courts have the authority to allocate travel costs for visitation. *See* Wyo. Stat. Ann. § 20-2-202(a)(ii) (district court has authority to allocate costs of transporting children for visitation); *Durham v. Durham*, 2003 WY 95, ¶ 19, 74 P.3d 1230, 1236 (Wyo. 2003) (district court accounted for father's visitation expenses); *In re Paternity of IC*, 971 P.2d 603, 606 (Wyo. 1999) (district court deviated downward from statutory child support guidelines to account for father's visitation travel costs). We have also recognized "that other courts have approved a decision requiring a parent to share in the expense of a situation that he or she helped to create." *Durham*, ¶ 21, 74 P.3d at 1236 (citing *Stanton v. Abbey*, 874 S.W.2d 493, 501 (Mo. Ct. App. 1994) ("We do not find it inequitable for mother to pay the transportation costs which resulted from her moving [from Missouri] to California with the children.")). Here, the district court allocated initial transportation costs to Father and, after the first transition period, assessed these costs to Mother. Mother does not pay child support or other expenses for EVG. Allocating

visitation costs after the initial transition period to Mother was not unreasonable. The district court did not abuse its discretion.

[¶33] Mother argues in its discussion of the mutual respect factor of EVG's best interest, *see supra* ¶ 24, the district court improperly considered her missed visitation with EVG while he lived in Bahrain, and the Bahraini lower court decision ordering her to pay travel costs was in effect. She asserts that visitation in Bahrain was not available during the pendency of her appeal there. She contends she missed some visits because Father left Bahrain without telling her, and she had to investigate on her own to find out where Father and EVG had moved. Mother argues her failed visits should not be counted against her because Father purposely moved to complicate her visitation.

[¶34] Contrary to Mother's assertion, the district court did not weigh missed visitation in Bahrain against her.[2] In its discussion of mutual respect, the district court made no reference to Mother's missed visitation in Bahrain. While it stated, "Mother takes little to no responsibility for her own shortcomings and failed visitation, instead blaming Father and/or [EVG] for failed attempts to parent," the district court attributed much of Mother's missed visitation and telephone communication with EVG to Father. It recognized, "Mother and [EVG] had a healthy relationship prior to Father's frequent and often unannounced relocations," and "Mother has made efforts to visit her child despite Father's resistance." Nonetheless, and regardless of fault, it found "Mother spent limited time alone with the minor child, and . . . the minor child was generally more inclined to remain with his father instead of visiting with his mother."

[¶35] Mother next contends that the district court abused its discretion when it found Mother interfered in EVG's schooling in Russia, which prompted Father and EVG to move from Russia, and when it found there was evidence of domestic violence by Mother. The district court found:

> For a time in 2018 and early 2019, while the child lived
> in Yaroslavl, Russia, Father brought the child to visit Mother
> in Moscow. For example, between Christmas and New Years,
> Mother spent the 29th of December to the 1st of January (3

---

[2] In discussing a *change of circumstances* warranting modification, the district court made the following finding regarding the proceeding in Bahrain:

> Mother also failed to exercise visitation with the minor child following entry of the Bahrain judgment. Specifically, in March 2021, the Bahrain trial court issued a judgment affording Mother 2 visits per week for 2 hours per visit. In July 2021, the appellate court reversed the Bahrain trial court's judgment. During the time the Bahrain judgment was in effect, Mother failed to exercise any visitation. According to Mother, she did not exercise visitation due to Bahrain law, wherein she would have to "execute" on the judgment and recognize its validity.

days) with the minor child. Thereafter, between October 2018 and May of 2019, Mother attended the minor child's basketball games and saw the child's school. Specifically, Mother testified that she visited the school once with Father, and another time in December 2019 "after [Father] left [Russia]." However, Father asserts Mother "interfered" with the child's schooling and, according to Father, Mother's interference caused the child to be removed from his "special program," discharged from school, and forced (again) to relocate. In response, Mother denies interfering with the minor child's schooling. Ultimately, the court finds both parties at fault for this forced relocation. Father's lack of communication and Mother's unilateral choice to involve herself in the school combined to cause this change in circumstance.

Regarding domestic violence, the district court explained:

> The strained relationship between the child and Mother came to an impasse on or around November 11, 2018, when Mother and the minor child had a "disagreement" over the minor child's phone. To this point, the evidence shows a growing dissension about the minor child's willingness and ability to spend quality time with Mother, and although Father had made efforts to facilitate visits, he repeatedly deferred to the child's preferences, leading to volatile conclusions.
>
> . . . According to Mother, the November 2018 incident involved the child "jumping" at her and knocking her on the bed. Mother claims she was "holding him very tightly" when "he started pulling on the phone, it . . . flipped out from my hands, bounced and hit his jaw." However, Mother claims the incident was not anything "intentional." Mother dropped off the child the next day after the child texted Father that "mama thinks this is all a joke." . . . The court does not find Mother's testimony concerning this incident credible.

The court concluded, "Despite the over-saturation of hypotheticals, there was credible evidence of spousal and child violence." In its order denying Mother's motion to amend, the district court referred to its order modifying custody, stating "the court made special findings of fact and conclusions of law . . . including Mother's violent history with Father and the minor child and how this may have contributed to Father's decision to relocate the minor child after Mother learned where the minor child attended school."

[¶36] Mother argues that these findings were not supported by the record. Our review is hampered by Mother's failure to designate the trial transcript as part of the record on appeal. The appellant must provide a record adequate to enable this Court's review. *See Rush v. Golkowski*, 2021 WY 27, ¶ 16, 480 P.3d 1174, 1178 (Wyo. 2021) ("We have cautioned that '[t]he appellant bears the responsibility of bringing forth a sufficient record for the Court's review.'" (citation omitted)); *Jones v. Artery*, 2012 WY 63, ¶ 9, 275 P.3d 1244, 1247 (Wyo. 2012) ("When this Court does not have a properly authenticated transcript before it, it must accept the trial court's findings of fact upon which it bases any decisions regarding evidentiary issues." (quoting *Lykins v. Habitat for Human.*, 2010 WY 118, ¶ 11, 237 P.3d 405, 408 (Wyo. 2010))). The record does not contain the transcript of the trial.[3] We, therefore, presume the evidence was sufficient to support the district court's findings and sustain those findings. *Jones*, ¶ 9, 275 P.3d at 1247 (quoting *Arnold v. Day*, 2007 WY 86, ¶ 9, 158 P.3d 694, 697 (Wyo. 2007)).

[¶37] Finally, Mother argues the district court cumulatively erred when it weighed the best interest factors and used them to restrict her ability to visit EVG. She argues this is especially evident given EVG's age and the district court's findings regarding Father's frequent relocations, his alienation of EVG from Mother, and his surrender of visitation decision-making to EVG. Mother invites us to reweigh the evidence. Our standard of review does not permit us to do so. *Vassilopoulos*, ¶ 13, 557 P.3d at 730; *Bailey v Bailey*, 2024 WY 65, ¶ 10, 550 P.3d 537, 543 (Wyo. 2024) (citing *Hyatt v. Hyatt*, 2023 WY 129, ¶ 48, 540 P.3d 873, 888 (Wyo. 2023)). The district court properly considered EVG's best interests and concluded that those interests weighed in favor of a graduated visitation schedule. This conclusion does not exceed the bounds of reason. *Baer v. Baer*, 2022 WY 165, ¶ 18, 522 P.3d 628, 635 (Wyo. 2022) (citation omitted).

### *CONCLUSION*

[¶38] The district court had jurisdiction over Mother's motion to modify visitation, and her appeal was timely. The district court did not abuse its discretion in the setting of terms and conditions for the modified visitation order. We affirm.

---

[3] The record before this Court contains the exhibits introduced at trial. The exhibits provide no evidence related to Mother's interference with EVG's schooling or the domestic violence incident referenced by the district court.